# 25-1999

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MAYA MCINTOSH,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

SARAH KUNSTLER
LAW OFFICE OF SARAH KUNSTLER
*Attorneys for Defendant-Appellant*
315 Flatbush Avenue, Suite 103
Brooklyn, New York 11217
(718) 783-3682

COUNSEL PRESS (800) 4-APPEAL • (391562)

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ..... iii

JURISDICTIONAL STATEMENT ..... 1

ISSUE PRESENTED ..... 2

STATEMENT OF THE CASE ..... 2

Offense Conduct ..... 3

The Plea Agreement ..... 4

The Guilty Plea ..... 5

i. Advisement of Rights ..... 6

ii. The Plea and Voluntariness ..... 6

iii. The Factual Basis for the Plea ..... 7

iv. The Plea Agreement and Possible Sentence ..... 8

v. Acceptance of the Plea ..... 9

The Initial Presentence Report and Guideline Calculation ..... 9

Objections to Probation’s Sentencing Calculation ..... 10

Defendant’s Opposition ..... 11

The Final Presentence Report and Guideline Calculation ..... 12

Defendant’s Sentencing Submissions ..... 13

The Government’s Sentencing Submission ..... 15

The Sentencing ..... 15

SUMMARY OF ARGUMENT ..... 18

ARGUMENT ..... 21

POINT I

MS. MCINTOSH WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING BECAUSE COUNSEL FAILED TO LITIGATE THE MECHANISM SPECIFICALLY PROVIDED BY THE GUIDELINES TO TEST WHETHER THE CONVERSION METHODOLOGY PRODUCED A RELIABLE RESULT ........ 21

A. The Standard ........ 21

B. Counsel Failed to Develop the Guidelines Departure Framework Despite Probation's Identification of the Issue and Ms. McIntosh's Efforts to Raise It ........ 23

C. Counsel's Failures Prejudiced Ms. McIntosh Because the Sentence Was Anchored to an Untested and Inflated Guidelines Range ........ 26

D. The Appeal Waiver Does Not Bar This Claim ........ 27

CONCLUSION ........ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Hunter v. United States*,
608 U.S. ___, 146 S. Ct. 1702 (2026) .... 27, 28

*Hunter v. United States*,
No. 24-1063, 2026 WL 1751815 (U.S. June 18, 2026) .... 20

*Strickland v. Washington*,
466 U.S. 668 (1984) .... 21

*United States v. Bodnar*,
37 F.4th 833 (2d Cir. 2022) .... 22

*United States v. Cronic*,
466 U.S. 648 (1984) .... 21

*United States v. Gaskin*,
364 F.3d 438 (2d Cir. 2004) .... 22

*United States v. Morrison*,
449 U.S. 361 (1981) .... 21

*United States v. Ortiz*,
100 F.4th 112 (2d Cir. 2024) .... 22

**Statutes & Other Authorities:**

18 U.S.C. § 1028(a)(7) .... 2

18 U.S.C. § 1028(b)(3)(A) .... 2

18 U.S.C. § 3553(a) .... 9, 14, 16, 17

21 U.S.C. § 841(b)(1)(C) .... 1, 2

28 U.S.C. § 1291 .... 2

28 U.S.C. § 2255 .... 28

F.R.A.P. Rule 4(b) .... 2

U.S.S.G. § 2D1.1 .... *passim*

U.S.S.G. § 2D1.1(b)(4) .... 5, 8, 10, 12

U.S.S.G. § 2D1.1(b)(7) .......... 5, 8, 10, 12
U.S.S.G. § 2D1.1(c)(5) .......... 11
U.S.S.G. § 2D1.1(c)(7) .......... 10
U.S.S.G. § 3B1.1(c) .......... 8, 10
U.S.S.G. § 3E1.1(a) .......... 5, 8, 12
U.S.S.G. § 3E1.1(b) .......... 5, 8, 12
U.S.S.G. § 4A1.3 .......... 13
U.S.S.G. § 5H1.1 .......... 13

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**
**-------------------------------------------------------------------X**

**UNITED STATES OF AMERICA,**

Appellee,

-against- **25-1999**

**MAYA MCINTOSH,**

Defendant-Appellant.

**-------------------------------------------------------------------X**

## JURISDICTIONAL STATEMENT

Jurisdiction was conferred in the United States District Court for the Northern District of New York by the filing of Indictment 24-cr-00365 charging appellant Maya McIntosh with nineteen counts arising from an alleged drug manufacturing and trafficking conspiracy. (A15–21.)[1] Appellant Maya McIntosh was charged with participating in two conspiracies to manufacture and traffic a controlled substance analogue in violation of 21 U.S.C. § 841(b)(1)(C) (Counts One and Eight); distribution and possession with intent to distribute a controlled substance analogue in violation of 21 U.S.C. § 841(b)(1)(C) (Counts Two through Four, Nine through Fourteen, and

[1] Citations to "A" refer to the Appendix; citations to "PSR" are to the Presentence Investigation Report.

Nineteen); and unlawful possession and use of a means of identification in violation of 18 U.S.C. §§ 1028(a)(7) and (b)(3)(A) (Counts Five through Seven and Fifteen through Eighteen).

Jurisdiction is conferred in this Court pursuant to 28 U.S.C. §1291 and Rule 4(b) F.R.A.P. This is an appeal from a final order disposing of all issues between the parties.

## ISSUE PRESENTED

Whether Ms. McIntosh was denied the effective assistance of counsel at sentencing, in violation of the Sixth Amendment, where defense counsel failed to litigate the conversion methodology and departure framework under U.S.S.G. § 2D1.1, Application Note 27(E), that determined the advisory Guidelines range, despite the issue being identified by the Probation Office, raised by the defendant, and acknowledged by the district court.

## STATEMENT OF THE CASE

This is an appeal from a judgment of the United States District Court for the Northern District of New York (Scullin, J.), entered July 31, 2025, convicting appellant Maya McIntosh, upon her plea of guilty, of Counts One, Eight, Eleven, Sixteen, and Eighteen of a nineteen-count indictment arising from her participation in a conspiracy to manufacture and traffic MDMB-4en-PINACA, a synthetic cannabinoid, in violation of 21 U.S.C. § 841(b)(1)(C). (A139–145.) The district court sentenced Ms. McIntosh

to 97 months' imprisonment, three years' supervised release, and the mandatory $500 special assessment.

This appeal turns on the methodology used to calculate Ms. McIntosh's advisory Guidelines range—specifically, the conversion of a synthetic cannabinoid into converted drug weight under the Guidelines' marijuana-equivalency ratio—and the failure of Ms. McIntosh's trial counsel to litigate the departure framework the Sentencing Guidelines provide for testing the reliability of that calculation. As the record reflects, the conversion methodology that determined the Guidelines range was identified by the Probation Office, questioned by Ms. McIntosh, and acknowledged by the district court, but was never meaningfully tested through adversarial litigation.

**Offense Conduct**

From approximately January 2023 through July 2024, Maya McIntosh participated in a scheme to manufacture and distribute the synthetic cannabinoid MDMB-4en-PINACA, including by mailing drug-soaked paper to inmates in correctional facilities (PSR pp. 39; 42; 48; ¶¶ 2–4, 14(a)–(b), 43). She obtained precursor chemicals, produced the drug in liquid form at her residence, and applied it to paper and envelopes that were disguised as legal documents (PSR pp. 42; 47; 48; ¶¶ 14(b), 37, 43). McIntosh then mailed these materials to incarcerated individuals, often using the names of attorneys as the sender, in order to evade detection and facilitate delivery into correctional facilities (PSR pp. 39–40; 42–43; 46; ¶¶ 5–6, 14(c)–(e), 33–

34). She also advertised the product through social media and sold it to individuals seeking to introduce contraband into prisons (PSR pp. 42–43; ¶ 14(c)).

On April 3, 2024, law enforcement executed a search warrant at McIntosh's residence and recovered large quantities of controlled substances, including more than 2 kilograms[2] of liquid MDMB-4en-PINACA, drug-soaked papers, cocaine, cocaine base, and fentanyl (PSR pp. 47; 48; ¶¶ 38, 44). McIntosh admitted to manufacturing and distributing the substances for profit and to using attorney identities in furtherance of the scheme (PSR p. 47; ¶ 39). The investigation further revealed that she obtained at least $42,476.58 in proceeds from the offense (PSR pp. 40; 43; ¶¶ 7, 14(g)).

**The Plea Agreement**

On March 18, 2025, pursuant to a written plea agreement, Ms. McIntosh agreed to plead guilty to Counts One, Eight, Eleven, Sixteen and Eighteen. (A10.)

In a handwritten change to the final agreement, the parties agreed to change the amount of MDMB-4en-PINACA found at her residence from approximately 5,502 grams to "at least 2,000 grams but possibly more." (A54.) The agreement did not resolve how that quantity would be converted into converted drug weight under the applicable Guidelines ratio, leaving that determination for sentencing.

[2] The PSR says "more than five kilograms," but as discussed below, the parties changed this to "more than 2,000 grams" (or 2 kilograms) in the plea agreement. (A22–A45.)

While the agreement did not fully calculate the applicable advisory Guidelines, the parties stipulated to the applicability of a two-level enhancement for distribution of a controlled substance in a correctional facility, pursuant to U.S.S.G. § 2D1.1(b)(4), an additional two-level enhancement for distributing a controlled substance through mass marketing, pursuant to U.S.S.G. § 2D1.1(b)(7), and a three-level reduction for acceptance of responsibility, pursuant to §§ 3E1.1(a) and (b). (A54–55.)

The agreement set forth statutory maximum penalties of up to 20 years' imprisonment on each of the principal counts of conviction, along with significant fines and a term of supervised release of at least three years and up to life. (A49–50.) Ms. McIntosh also agreed to pay a $100 special assessment per count, consented to restitution, and agreed to forfeiture, including a money judgment of $42,476.58. (A47.)

The government agreed, in exchange, to dismiss the remaining counts at sentencing and not to pursue additional federal charges based on the conduct described in the indictment and factual basis of the plea. (A48–49.)

Finally, Ms. McIntosh agreed to waive her right to appeal or collaterally attack her conviction and any sentence of 210 months' imprisonment or less, preserving her right to appeal based on ineffective assistance of counsel. (A55–56.)

**The Guilty Plea**

On March 18, 2025, Ms. McIntosh appeared before the Honorable Anne M. Nardacci who handled the proceeding for the Honorable Frederick J. Scullin. Ms.

McIntosh entered a guilty plea to Counts 1, 8, 11, 16, and 18 of the indictment pursuant to a written plea agreement. (A69–105.)

**i. Advisement of Rights**

Ms. McIntosh was placed under oath and advised of the penalties for perjury. The district court inquired into her background, confirming that she was 33 years old, had obtained a GED, worked as a nursing assistant and aesthetician, and was not under the influence of drugs, alcohol, or medication. She affirmed that she was able to understand the proceedings and communicate with counsel. (A71–74.)

The court confirmed that Ms. McIntosh had reviewed the indictment with counsel and understood the charges against her. (A74.) The court then advised her of her trial rights, including her right to plead not guilty, her right to a jury trial, her right to confront and cross-examine witnesses, her right to compel witnesses, and her right against self-incrimination, and explained that if she pleaded guilty, she would be waiving these rights, and would be adjudged guilty of the offense. (A74–75.)

**ii. The Plea and Voluntariness**

After the charges against her were read aloud by the court, Ms. McIntosh pleaded guilty to Counts 1, 8, 11, 16, and 18. (A76–80.) The court confirmed that she had reviewed the plea agreement with counsel, was satisfied with counsel's representation, and had not been induced to plead guilty by any promises or threats

outside the agreement. She affirmed that she was pleading guilty freely and voluntarily. (A80–81.)

### iii. The Factual Basis for the Plea

The government outlined the elements of each offense and described the evidence it would present at trial, including that Ms. McIntosh conspired to manufacture and distribute MDMB-4en-PINACA, distributed that substance to individuals in correctional facilities by mailing drug-soaked paper disguised as legal correspondence, and used the identities of others without authorization to facilitate that conduct. (A81–87.)

Following the government's recitation, a dispute arose regarding the weight of the controlled substance. (A87.) Ms. McIntosh herself questioned how the seized liquid had been weighed, asking whether agents had weighed the cooler itself or only the liquid contents, and explaining that the liquid included acetone used in the manufacturing process. The parties thereafter amended the plea agreement to reflect that the offense involved "at least 2,000 grams" of MDMB-4en-PINACA, with the precise quantity to be determined at sentencing. (A90–93.)

Ms. McIntosh confirmed that the government's description of her conduct, as modified, was accurate and that she had committed the charged offenses. (A93.)

The parties thus left both the ultimate drug quantity and the resulting Guidelines calculation to be determined at sentencing.

### iv. The Plea Agreement and Possible Sentence

At the district court's request, the government reviewed the potential penalties, including a maximum term of imprisonment of 20 years on each count, supervised release of at least three years and up to life, fines, forfeiture, restitution, and mandatory special assessments, as well as the collateral consequences of pleading guilty. (A95–97.)

The government further provided the following estimate of its view as to how the Guidelines would apply, noting that the calculation was disputed with respect to the amount of drugs involved:

| | |
|---|---|
| Base Offense Level | 30 |
| Distribution of a controlled substance in a correctional facility (§ 2D1.1(b)(4)) | +2 |
| Distribution of a controlled substance through mass marketing (§ 2D1.1(b)(7)) | +2 |
| Aggravated Role (§3B1.1(c)) | +2 |
| Acceptance of Responsibility (§§ 3E1.1(a) and (b)) | -3 |
| Total Offense Level | 33 |

With a total offense level of 33 and an estimated Criminal History Category of III, the government estimated that Ms. McIntosh's advisory Guidelines range would be 168 to 210 months' incarceration. (A97–98.)

The district court also explained that it would not be able to determine how the Guidelines applied until after it received and reviewed the Presentence Report from

Probation, and that it would also consider possible departures and other factors under 18 U.S.C. § 3553(a), and that Ms. McIntosh would not have a right to withdraw her plea after it was entered. (A98–100.)

Ms. McIntosh confirmed she was pleading voluntarily, without threats or promises beyond the agreement, and the district court confirmed with Ms. McIntosh's attorney that Ms. McIntosh understood the nature of the charges against her and the consequences of her plea. (A100–101.) The court further reviewed the appellate waiver provision of the plea agreement, confirming that Ms. McIntosh understood that she was waiving her right to appeal or collaterally attack any sentence of 210 months or less. (A101.)

**v. Acceptance of the Plea**

Based on the statements of the government, defense counsel and Ms. McIntosh, the court found that Ms. McIntosh was competent, that her plea was knowing and voluntary, and that there was an adequate factual basis for the plea. The court accepted the plea and adjudged her guilty. (A103–104.)

**The Initial Presentence Report and Guideline Calculation**

In a draft Presentence Report, dated June 20, 2025, Probation determined that "[l]aboratory reports showed a total of 3,044.87 grams of MDMB-4en-PINACA, 24.66 grams of cocaine base, 18.51 grams of cocaine, and 4.3 grams of fentanyl." (PSR p. 13; ¶ 44.)

Probation used these weights to calculate a converted drug weight of 675.28 kg, using the Drug Conversion Tables in Application Note 8(D), which call for a converted drug weight of 167 grams for every gram of a synthetic cannabinoid, 2.5 kg for each gram of fentanyl, and 3,571 grams for every gram of cocaine base, reaching a total of 675.28 kg of converted drug weight. Because this number was more than 400 kg but less than 700 kg, Probation calculated a Base Offense Level of 26, pursuant to 2D1.1(c)(7). (PSR pp. 14–15; ¶ 51.)

Probation did not include a two-level increase pursuant to §3B1.1(c) for aggravated role. With a base offense level of 26; a two-level increase pursuant to § 2D1.1(b)(7); and a second two-level increase pursuant to § 2D1.1(b)(4); Probation arrived at an adjusted offense level of 30 which it reduced to 27 after deducting three points for acceptance of responsibility. (PSR pp. 14–19; ¶¶ 51–88.)

With a CHC of III, this resulted in an advisory Guidelines range of 87 to 108 months' imprisonment. (PSR p. 23; ¶ 110.)

**Objections to Probation's Sentencing Calculation**

On July 2, 2025, defense counsel submitted a letter stating that it had no objections to the draft PSR. (A109.)

On July 10, 2025, six days outside of the 14-day window for the parties to make objections to the PSR, the government submitted its objections, asking the district court to accept the late filing. (A110–113.)

The government argued that the correct drug weight was 1,523 kilograms of Converted Drug Weight, yielding a base offense level of 30 pursuant to U.S.S.G. §2D1.1(c)(5). (A110.) The government explained that the PSR had omitted certain mailed parcels containing MDMB-4en-PINACA that should have been included in the total, and had inaccurately stated that the amount of MDMB-4en-PINACA found during a search of Ms. McIntosh's residence was 237.84 grams, when the correct weight was 5,502 grams. (A110–111.) The government calculated the total Converted Drug Weight as follows:

| **Substance** | **Weight (grams)** | **CDW (kilograms)** |
|---|---|---|
| MDMB-4en-PINACA | 8,124.64 | 1,356.81 |
| Cocaine Base | 42.66 | 152.34 |
| Cocaine | 18.51 | 3.70 |
| Fentanyl | 4.3 | 10.75 |
| **TOTAL CDW** | | **1,523.6** |

(A112.) This recalculation more than doubled the converted drug weight and resulted in a significantly higher base offense level.

**Defendant's Opposition**

In a letter dated July 10, 2025, defense counsel opposed the government's calculation of the drug weight and asked the court to disregard the government's late submission. Defense counsel did not challenge the methodology used to calculate the drug weight. Instead, counsel stated: "I have never dealt with a controlled

substance in this form, so I must admit that I relied on the findings of the Probation Department in scoring the Base offense level appropriately." (A121.)

In a text order docketed on July 11, 2025, the district court granted the government's motion to file its objections late, deeming the objections timely filed. (A11.)

**The Final Presentence Report and Guideline Calculation**

In the final PSR, Probation adopted the following revised Guidelines calculation, based on the drug weights provided by the government:

| | |
|---|---|
| Base Offense Level | 30 |
| Distribution of a controlled substance in a correctional facility (§ 2D1.1(b)(4)) | +2 |
| Distribution of a controlled substance through mass marketing (§ 2D1.1(b)(7)) | +2 |
| Acceptance of Responsibility (§§ 3E1.1(a) and (b)) | -3 |
| Total Offense Level | 31 |

(PSR pp. 49–52; ¶¶ 51–77.)With a criminal history category of III, this resulted in an advisory Guidelines range of 135 to 168 months' imprisonment. (PSR p. 45; ¶ 90.)

The PSR also identified several potential grounds for departure. (PSR pp. 61; ¶¶ 129–133.) Of particular relevance, the Probation Office noted that pursuant to USSG §2Dl.l, Application Note 27(E), in cases involving synthetic cannabinoids, a downward departure may be warranted where the substance is diluted with an unusually high quantity of base material or where a greater quantity is required to

produce the typical effect associated with such substances. (PSR p. 61; ¶ 130.) This provision specifically recognizes that the standard conversion methodology for synthetic cannabinoids may overstate the seriousness of the offense and provides a mechanism for adjustment based on dilution and potency. The PSR further noted that a departure might be warranted pursuant to USSG §4Al.3, if Ms. McIntosh's criminal history category overstated the seriousness of her prior conduct, and that the court could consider Ms. McIntosh's age at the time of the offense or at the time of prior offenses pursuant to USSG §5Hl.l. (PSR p. 61; ¶¶ 131; 132.)

**Defendant's Sentencing Submissions**

In a two-page, double-spaced sentencing submission dated July 10, 2025[3], defense counsel stated that Ms. McIntosh did not contest the factual account of the offense conduct as set forth in the Presentence Investigation Report. (A114–115.) Counsel described Ms. McIntosh as a 33-year-old woman with a difficult personal history, including the early deaths of close family members, significant caregiving responsibilities for her mother, and longstanding substance abuse beginning in adolescence. Counsel also noted that Ms. McIntosh had been in a relationship with an individual involved in criminal activity who influenced her conduct. (*Id.*)

[3] Counsel also filed a sealed version of this letter, containing some additional confidential information, which was also two pages long. (CA1–CA2.)

The submission emphasized that Ms. McIntosh accepted responsibility for her actions, acknowledged the seriousness of distributing controlled substances into correctional facilities, and would benefit from substance abuse treatment while incarcerated. Counsel requested a downward variance pursuant to 18 U.S.C. § 3553(a), seeking a sentence in the range of 65 to 70 months' imprisonment in light of her personal history, lack of violent criminal conduct, and rehabilitative potential. (A115.) Counsel's submission did not mention USSG §2Dl.l, Application Note 27(E) or in any way raise the potency or dilution of the MDMB-4en-PINACA or the validity of the 1:167 conversion ratio.

On July 22, 2025, counsel filed a one-page, single-spaced letter supplementing the initial sentencing submission, attaching certificates of completion from programs Ms. McIntosh participated in while incarcerated and awaiting sentence, as well as "cases which she respectfully asks that the Court consider while determining the correct calculations of her multiple drugs." (A122–131.) Defense counsel further explained, "Maya has consistently believed that the conversion rates for this substance should be lower than scored and that is why the plea agreement was manually amended prior to plea." (A122.)

The materials provided by Ms. McIntosh directly addressed the conversion ratio and the Sentencing Commission's treatment of synthetic cannabinoids, including Amendment 807 and the departure considerations reflected in Application

Note 27(E). Counsel attached those materials, but did not develop their argument, request testing or expert assistance, present evidence, or explain how they supported a lower Guidelines calculation or departure.

**The Government's Sentencing Submission**

In its sentencing submission, dated July 10, 2025, the government adopted the Guidelines range calculated by Probation in its final PSR, which resulted in an advisory Guidelines range of 135 to 168 months' imprisonment. The government requested a sentence within the Guidelines range, followed by a term of supervised release. (A116–120.)

**The Sentencing**

The parties appeared for sentencing before Senior Judge Frederick J. Scullin Jr. on July 31, 2025. (A132.) The court confirmed appearances and stated that it had reviewed the Presentence Investigation Report ("PSR"), its addenda, the amended plea agreement, and the parties' sentencing submissions. (A133–134.)

The court then asked whether there were any remaining objections to the factual findings or Guidelines calculations set forth in the PSR, which employed the 1:167 conversion ratio for synthetic cannabinoids. Defense counsel responded that there were no objections. (A134.)

The court therefore adopted the PSR in full without further inquiry into the methodology used to calculate the Guidelines range and determined that the total

offense level was 31, the Criminal History Category was III, and the resulting advisory Guidelines range was 135 to 168 months' imprisonment. (*Id.*)

Before sentence was imposed, Ms. McIntosh addressed the Court and raised concerns regarding the calculation of drug weight and the resulting Guidelines range. She questioned the "excessiveness" of the conversion methodology used for synthetic cannabinoids, including the application of a 1-to-167 ratio, and expressed concern that the conversion resulted in a significantly higher Guidelines range than the actual weight of the substances involved. She also questioned whether amendments to the Sentencing Guidelines relating to synthetic cannabinoids applied to her case. (A135–137.)

The district court sought to clarify whether Ms. McIntosh was challenging Probation's drug-weight calculation, the conversion method under the Guidelines, or both. Ms. McIntosh responded that she was challenging "the conversion method and what they objected to in the PSR," and explained that she understood her plea to involve the substances found in her home, not additional quantities sent by mail. (A135–A136.) The court then asked defense counsel to "straighten this out." (A136.) Rather than address the conversion-methodology and drug-quantity concerns Ms. McIntosh had raised, counsel responded only that Ms. McIntosh's statements were "not accurate," and explained that the parties had amended the plea agreement to

reflect that the offense involved at least 2,000 grams of MDMB-4en-PINACA, resolving an earlier dispute regarding drug quantity. (A136.)

At no point did defense counsel adopt or develop Ms. McIntosh's challenge. Defense counsel did not address the validity of the 1:167 conversion ratio, did not analyze the applicability of Application Note 27(E), and did not present evidence, request a hearing, or otherwise develop the issue. Instead, counsel made only a cursory reference to Probation's recognition of the possibility of a departure, without articulating any factual or legal basis for such relief, stating "[b]ecause of this specific issue about the dilution of a concentrated cannibus [sp], it's really hard to scientifically, as she said, measure accurately." (A137–A138.) Counsel asked the court to consider Ms. McIntosh's history and circumstances and to "depart downward to a level under the decided guidelines." (A138.)

The government relied on its written submissions and emphasized that the defendant was properly held accountable for the full scope of the offense conduct, including distributions to correctional facilities, as relevant conduct under the Guidelines. (A138–139.)

After considering the parties' arguments and the factors set forth in 18 U.S.C. § 3553(a), the court expressly adopted the Guidelines calculation set forth in the PSR and varied downward from that range, imposing a below-Guidelines sentence of 97 months' imprisonment on each count, to run concurrently. The Court explained that

the sentence reflected both the seriousness of the offense—including the manufacture and distribution of controlled substances into correctional facilities—and the defendant's personal history and characteristics, including her lack of prior felony convictions and family support. (A139–140.)

The court imposed a three-year term of supervised release on each count, to run concurrently, and adopted the standard and special conditions recommended in the PSR without objection. The court imposed the mandatory $500 special assessment, declined to impose a fine, and did not order restitution. (A140–141.)

Finally, the court advised Ms. McIntosh of her appellate rights, noting that she had waived her right to appeal any sentence of 210 months or less pursuant to the plea agreement, and explained the procedure for filing a notice of appeal. (A141.) At the government's request, the court dismissed the remaining counts of the indictment and clarified that it had granted a downward variance and not a departure. (A141–143.)

## SUMMARY OF ARGUMENT

Ms. McIntosh was denied the effective assistance of counsel at sentencing. The advisory Guidelines range was driven by the conversion of MDMB-4en-PINACA, a synthetic cannabinoid, into converted drug weight under the Guidelines' synthetic-cannabinoid ratio. The Sentencing Guidelines themselves recognize that this methodology may overstate offense seriousness in particular cases and provide a

specific mechanism for downward departure where dilution or potency makes the ordinary conversion ratio unreliable. See U.S.S.G. § 2D1.1, Application Note 27(E).

Counsel failed to litigate that mechanism. The issue was not obscure or speculative. It surfaced at the plea proceeding, when Ms. McIntosh questioned the drug quantity and explained that the seized liquid included acetone used in the manufacturing process—a concern that went directly to whether the liquid mixture overstated the amount of actual controlled substance involved. The parties amended the plea agreement and left the final quantity and Guidelines calculation for sentencing. The Probation Office later identified Application Note 27(E) as a potential basis for departure. Ms. McIntosh continued to raise the same basic concern, first in handwritten materials that she provided to her attorney, which he appended to a July 22, 2025 submission to the court, and again at sentencing, where she challenged the “excessiveness” of the 1:167 ratio.

Despite all of that, counsel did not meaningfully develop the issue. Counsel acknowledged that he had “never dealt with a controlled substance in this form” and had relied on Probation’s base-offense-level calculation. But counsel did not analyze Application Note 27(E), did not seek testing, expert assistance, or other evidence bearing on dilution, concentration, or potency, did not request a hearing, and did not create a record that would allow the district court to evaluate whether the converted drug weight overstated the seriousness of the offense.

That deficient performance prejudiced Ms. McIntosh. The final advisory Guidelines range of 135 to 168 months served as the benchmark for sentencing. Although the district court varied downward and imposed a 97-month sentence, that sentence remained anchored to the untested advisory Guidelines range. There is at least a reasonable probability that, had counsel competently litigated the conversion methodology, the departure framework, and the drug-quantity concerns raised at sentencing, the district court would have begun from a lower Guidelines benchmark and imposed a lower sentence.

The appeal waiver does not bar review. The plea agreement expressly exempts claims of ineffective assistance of counsel from the waiver, and this appeal raises a Sixth Amendment claim based on counsel's deficient performance at sentencing. Even if the plea agreement did not include such a carveout, the Supreme Court has long held, and recently reaffirmed in *Hunter v. United States*, No. 24-1063, 2026 WL 1751815 (U.S. June 18, 2026), that "an appeal waiver tainted by ineffective assistance of counsel is unenforceable." *Id.* at *8. *Hunter* provides an additional reason not to enforce the waiver. *Hunter* holds that an appeal waiver should not be enforced where enforcement "would leave in place the kind of egregious error that would bring the judicial system into disrepute." *Id.* at *1. Enforcing the waiver here would insulate a sentencing proceeding in which counsel failed to litigate the very Guidelines

mechanism designed to test whether the synthetic-cannabinoid conversion ratio overstated offense seriousness.

## ARGUMENT

## POINT I

## MS. MCINTOSH WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING BECAUSE COUNSEL FAILED TO LITIGATE THE MECHANISM SPECIFICALLY PROVIDED BY THE GUIDELINES TO TEST WHETHER THE CONVERSION METHODOLOGY PRODUCED A RELIABLE RESULT

### A. The Standard

A criminal defendant receives ineffective assistance of counsel where her attorney's "representation f[alls] below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's . . . errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Under this demanding standard, "the defendant must overcome the presumption that, under the circumstances," the actions or omissions complained of "might be considered sound legal strategy." *Id*. at 689 (internal quotation omitted). *See also United States v. Cronic*, 466 U.S. 648, 659 (1984) (noting that prejudice is presumed "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."). Where this standard is met, the remedy "should be tailored to the injury suffered from the constitutional violation." *United States v. Morrison*, 449 U.S. 361, 364 (1981).

While this Court has "often refrained from considering an ineffective assistance claim on direct appeal when there has been no opportunity to fully develop the [relevant] factual predicate," *United States v. Ortiz*, 100 F.4th 112, 118 (2d Cir. 2024) (internal quotation omitted), there are cases where "the factual record *is* fully developed and resolution of the Sixth Amendment claim on direct appeal is beyond any doubt," *United States v. Bodnar*, 37 F.4th 833, 845 (2d Cir. 2022) (emphasis added). *See also United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004).

This case presents a breakdown in the adversarial process at the precise point where the Sentencing Guidelines depend on counsel to function properly. The advisory range imposed on Ms. McIntosh was driven by a conversion methodology for a synthetic cannabinoid that the Guidelines themselves recognize may produce distorted results. The Commission's framework is explicit: courts are to calculate the offense level based on the full weight of the cannabinoid mixture using the applicable equivalency ratio, but then must consider whether that calculation overstates the seriousness of the offense through departures based on concentration and potency. U.S.S.G. § 2D1.1, Application Note 27(E). That second step depends on adversarial development. Here, it never meaningfully occurred.

### B. Counsel Failed to Develop the Guidelines Departure Framework Despite Probation's Identification of the Issue and Ms. McIntosh's Efforts to Raise It

The advisory Guidelines range in this case turned on the application of the Guidelines' 1:167 marijuana-equivalency ratio for synthetic cannabinoids, which was used to determine converted drug weight attributable to MDMB-4en-PINACA. That ratio converted the substances attributed to Ms. McIntosh into approximately 1,500 kilograms of marijuana equivalent, yielding a base offense level of 30 and a final Guidelines range of 135 to 168 months.

That calculation was outcome-determinative. A materially different approach, whether through a different equivalency or a properly developed departure, would have resulted in a dramatically lower range, approximately 70 to 87 months. The conversion methodology was thus the central issue at sentencing.

The Sentencing Commission has expressly recognized that applying generic equivalencies to synthetic cannabinoids may produce inaccurate or exaggerated results and has provided a mechanism for adjustment. Application Note 27(E) authorizes a downward departure where the substance is diluted with an unusually high quantity of base material or where a greater quantity is required to produce effects comparable to benchmark cannabinoids.

The relevance of that provision was explicit in this case. The Probation Office identified Application Note 27(E) in the final Presentence Investigation Report as a

potential basis for departure. But the issue was not raised by Probation alone. Ms. McIntosh herself tried to bring it to the court's attention: first through handwritten materials provided to counsel and attached to counsel's July 22 submission, and again at sentencing, when she questioned the "excessiveness" of the 1:167 conversion ratio. The district court directly engaged with those concerns and sought to clarify whether Ms. McIntosh was challenging Probation's drug-weight calculation, the conversion method under the Guidelines, or both.

Thus, the issue was squarely before the district court and had been apparent since the plea proceeding, when Ms. McIntosh questioned the weight of the seized liquid, explained that it included acetone, and the parties amended the agreement while leaving drug quantity and the resulting Guidelines calculation for sentencing. Yet counsel failed to develop it. When the district court asked counsel to "straighten this out," counsel did not clarify the nature of Ms. McIntosh's objection, preserve any challenge to the disputed quantity calculation, or connect her concerns to the departure framework in Application Note 27(E). Instead, counsel responded only that Ms. McIntosh's statements were "not accurate" and pointed back to the amended plea agreement's reference to at least 2,000 grams of MDMB-4en-PINACA.

Counsel's own submission confirms that the failure was not strategic. In opposing the government's revised drug-weight calculation, counsel acknowledged:

"I have never dealt with a controlled substance in this form, so I must admit that I relied on the findings of the Probation Department in scoring the Base offense level appropriately." (A121.) But Probation's calculation did not answer the question counsel needed to litigate. The Guidelines themselves recognize that the synthetic-cannabinoid conversion ratio may overstate offense seriousness where dilution or potency makes the ordinary ratio unreliable. U.S.S.G. § 2D1.1, Application Note 27(E). Counsel's unfamiliarity with the substance therefore made investigation and adversarial testing more necessary, not less.

Counsel did not analyze the applicability of Application Note 27(E), did not seek testing, expert assistance, or other evidence bearing on dilution, concentration, or potency, did not present evidence regarding those issues, did not request a hearing, and did not otherwise create a record upon which the district court could exercise its discretion. Instead, counsel recounted the modification to the plea agreement and made only a cursory reference to the possibility of a departure, without developing any argument tied to the Guidelines provision specifically identified by Probation.

Nor did counsel's written sentencing submissions cure that omission. Counsel's principal submission consisted of a brief mitigation request seeking a downward variance based on personal history and rehabilitation, while failing to develop the Guidelines issues that drove the advisory range: the conversion methodology, Application Note 27(E), and the disputed drug quantity.

This was not a strategic decision. It was a failure to perform the basic function of counsel at sentencing. The Guidelines framework for synthetic cannabinoids anticipates that the initial conversion may be unreliable and relies on adversarial litigation to inform the court's exercise of discretion. Counsel did not fail to win a departure; he failed to present one in a form the court could evaluate.

### C. Counsel's Failures Prejudiced Ms. McIntosh Because the Sentence Was Anchored to an Untested and Inflated Guidelines Range

Counsel's failures were prejudicial. The unchallenged conversion methodology and undeveloped departure analysis produced a Guidelines range of 135 to 168 months. A materially lower conversion figure, a properly developed departure, or a properly litigated drug-quantity dispute would have produced a substantially lower advisory range. That difference mattered because the Guidelines range served as the starting point and benchmark for the sentence imposed.

The district court imposed a below-Guidelines sentence of 97 months, but that sentence remained anchored to the inflated range. The court adopted the PSR in full and began its analysis from the higher range before varying downward.

Even a substantial variance from an inflated range does not eliminate prejudice where the district court began from the erroneous benchmark. Where the benchmark is artificially elevated, even a variance reflects the gravitational pull of the erroneous range.

The prejudice here is not speculative. It is embedded in the Guidelines framework the court used to impose sentence. That framework depends on adversarial testing at precisely the point where counsel failed to act, despite the issue having been identified by Probation, raised by Ms. McIntosh, and recognized by the district court. The resulting sentence rests on an unexamined conversion methodology and an undeveloped departure analysis that the Guidelines themselves anticipate.

There is at least a reasonable probability that, had counsel competently litigated the departure framework, the conversion methodology, or the drug-quantity issues raised at sentencing, the district court would have adopted a lower Guidelines range as its initial benchmark and starting point and imposed a lower sentence.

### D. The Appeal Waiver Does Not Bar This Claim

Ms. McIntosh's ineffective-assistance claim is not barred by the appeal waiver because the plea agreement expressly preserves claims of ineffective assistance of counsel. The claim raised here is just that: counsel's constitutionally deficient performance at sentencing and the resulting prejudice.

Even apart from that express carveout, *Hunter* confirms that "an appeal waiver tainted by ineffective assistance of counsel is not enforceable." *Hunter v. United States*, 608 U.S. ___, 146 S. Ct. 1702, 1711 (2026). Should this Court nonetheless conclude that the waiver could otherwise apply, it should not enforce the waiver to

bar this claim. Hunter holds that an appeal waiver should not be enforced where enforcement "would leave in place the kind of egregious error that would bring the judicial system into disrepute." *Id.* at 1708.

This case involves more than ordinary sentencing-error review. Ms. McIntosh seeks review of a sentencing proceeding in which counsel failed to litigate the very Guidelines mechanism designed to test whether the synthetic-cannabinoid conversion ratio overstated the seriousness of the offense, after the Probation Office identified the relevant departure provision and Ms. McIntosh herself raised the issue. Enforcing the waiver in those circumstances would insulate a breakdown in the adversarial sentencing process from review.

The existing record is sufficient to resolve the claim because it shows both counsel's omission and the significance of that omission to the sentencing outcome. The Court should therefore vacate the sentence and remand for resentencing. However, should this Court conclude that additional factual development is necessary before resolving the ineffective-assistance claim, it should decline to resolve the claim on the present record without prejudice to Ms. McIntosh's ability to raise it in a motion under 28 U.S.C. § 2255. In all events, the appeal waiver should not be enforced to bar a claim the plea agreement expressly preserved.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, this Court should vacate Ms. McIntosh's sentence and remand for resentencing, and grant such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
August 10, 2026

Respectfully submitted,



SARAH KUNSTLER
315 Flatbush Avenue
Suite 103
Brooklyn, NY 11217
(718) 783-3682
*Attorney for Defendant-Appellant*
*Maya McIntosh*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times New Roman proportional font and contains 5,947 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure.

Dated: Brooklyn, New York
August 10, 2026

Sarah Kunstler, Esq.

*Attorney for Defendant-Appellant*
*Maya McIntosh*